RODLIN E. BUNNEY AND ESTATE OF JOAN K. BUNNEY, DECEASED, RODLIN E. BUNNEY, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bunney v. Commissioner
Docket No. 1685-86.
United States Tax Court
T.C. Memo 1988-112; 1988 Tax Ct. Memo LEXIS 145; 55 T.C.M. (CCH) 394; T.C.M. (RIA) 88112; March 15, 1988; As amended March 17, 1988 *145 P was a shareholder of CVI and wished to obtain control of the corporation. P was unable to obtain a personal loan to buy the outstanding shares from the other CVI shareholders. However, a bank agreed to lend CVI sufficient funds to redeem its stock from its shareholders other than P. Held, the redemption did not constitute a constructive dividend to P because P did not incur a primary personal obligation to purchase the stock. Held further, P failed to report $ 3,570 in commission income in 1981. Held further, P is liable for additions to tax as set forth in R's notice of deficiency. Michael J. Abramovitz, for the petitioners. James B. Martin, Jr. and Bruce A. Anderson, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the following taxable years: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1] *146 Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6654
1977
$ 2,270
$    567   $   141    $ -
$ -   1978
81,543
20,349   4,108    -
-   1979
38,135
9,533   2,388    -
156   1980
-
259   160    -
156   1981
5,049
1,262   252    50% of interest
-   due on underpayment
of tax claimed
After concessions, the issues for decision are (1) whether redemption of the stock belonging to all shareholders of Cathedral Valley, Inc., other than petitioner and his family constituted a constructive dividend to petitioner-husband; (2) whether petitioners failed to report $ 3,570 in commission income in 1981; and (3) whether petitioners are liable for additions to tax as set forth in respondent's notice of deficiency. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Rodlin E. Bunney and Joan K. Bunney resided in Colorado Springs, Colorado, at the time the petition in this case was filed. [2]
Petitioner's Federal income tax returns for the taxable years 1977 through *147 1981, inclusive, were filed late. No extensions of statutory filing dates were requested for the years in issue. Petitioner's returns were filed as follows: Form 1040 for
Due
Date
Time
Taxable Year
Date
Filed
Overdue
1977
4/15/78
12/08/81
3 yrs. 8 mos.
1978
4/15/79
12/15/81
2 yrs. 8 mos.
1979
4/15/80
8/28/84
4 yrs. 4 mos.
1980
4/15/81
8/28/84
3 yrs. 4 mos.
1981
4/15/82
8/28/84
2 yrs. 4 mos.
Petitioner understated his interest income on his 1978, 1979 and 1981 Federal income tax returns in the respective amounts of $ 15, $ 1,134 and $ 467. Petitioner failed to report $ 3,145 and $ 2,537 of income deposited into his bank accounts in 1977 and 1978, respectively. Petitioner failed to report as income on his 1979 Federal income tax return $ 6,000 in consulting fees. Petitioner was a shareholder in Cathedral Valley Inc. (hereinafter referred to as CVI), throughout the taxable years in 1978 and 1979. On November 2, 1978, CVI had at least $ 30,204 of current earnings and profits and at least $ 181,141 of accumulated earnings and profits. On December 31, 1979, CVI had at least $ 129,675 of current earnings and profits. Petitioner's basis in his CVI stock was $ 10,000 in 1978. In late 1977 petitioner sought to obtain *148 control of CVI. Petitioner approached the United Bank of Colorado Springs (hereinafter referred to as the bank or UBCS), and the attorneys of the bank suggested a redemption transaction. Petitioner was unable to obtain a personal loan to purchase the stock himself because he lacked sufficient assets to pledge as security for the loan. To facilitate the transaction, UBCS agreed to lend CVI $ 275, 000 to redeem the stock of its shareholders other than petitioner and his family. This loan was secured by assets of the corporation. At a special meeting of the shareholders of CVI in August, 1978, a discussion was held concerning a possible dissolution of the corporation and a proposed offering by petitioner for all the shares except those belonging to petitioners. At the meeting the corporation's accountant delivered a lengthy presentation and concluded that the anticipated net distribution to shareholders after the proposed dissolution would be approximately $ 4.18 per share. By letter dated September 26, 1978, together with several attachments, including a stock purchase agreement, petitioner transmitted an offer to the other shareholders to either purchase their shares himself or *149 assign his right to purchase their shares to CVI, which would then redeem their shares. This letter provides as follows: Dear [shareholder]: Please find enclosed the following documents: (1) Stock Purchase Agreement which describes my offer to purchase your stock; (2) A Transmittal Letter to be completed and sent by you or your bank or trust company to the United Bank of Colorado Springs, Colorado, if you agree to the terms and conditions of the Stock Purchase Agreement; (3) A Stock Power to be completed by you if you agree to sell your stock; and (4) A Proxy to consent to a possible redemption and related borrowing by the Company. I intend to purchase your stock, under the terms and conditions described in the enclosed Stock Purchase Agreement, by one of the following methods: (1) A purchase of your stock directly by myself which would result in myself owning 100 percent of the stock of Cathedral Valley, Inc.; or (2) Assigning my right to purchase your stock to Cathedral Valley, Inc., which will then redeem your stock which would result in myself owning 100 percent of the stock of Cathedral Valley, Inc. Whichever method is chosen will not affect your tax consequences on the sale *150 of your stock. The ultimate goal of either method is for me to obtain 100 percent of the stock of Cathedral Valley, Inc., according to the terms and conditions of the Stock Purchase Agreement enclosed hereto. In order for me to partly finance the purchase of your stock by the assets of Cathedral Valley, I will either pledge the stock I receive in the tender offer if I purchase the stock outright, or I will have Cathedral Valley pledge its assets with the United Bank of Colorado Springs, Colorado, if I have Cathedral Valley redeem the stock. If you have any questions concerning my offer to purchase, please let me know. Sincerely yours, Rodlin E. Bunney JMK: dle Enclosures 4 The stock purchase agreement sent by petitioner to the other CVI shareholders defined the purchaser as "Rodlin E. Bunney, or assigns." In the stock purchase agreement the purchaser offered to purchase shares of CVI common stock (one dollar par value) for $ 4.18 per share, subject to the terms and conditions set forth in the agreement, which included provisions that (1) the purchaser would be obligated to purchase all outstanding CVI shares validly tendered and (2) the tendering shareholders would tender their shares *151 irrevocably in consideration of the undertakings of the purchaser specified in the agreement. Paragraph 3 of the stock purchase agreement provided: It is the intent of this offer made by the Purchaser to all stockholders of the Company to acquire all of the outstanding shares of the Common Stock of the Company. In the event that all of the outstanding Common Stock of the Company, which the Purchaser believes to be 77,225 shares, is not tendered prior to the Expiration Date, or, if applicable, the Extended Expiration Date, along with the enclosed Proxy, Purchaser may, at his option, revoke the offer to purchase as described herein. The stock purchase agreement was signed by petitioner in his individual capacity. CVI was not an original party to the stock purchase agreement. However, paragraph 13 of the stock purchase agreement contemplated a possible stock redemption by CVI by providing: 13. Stock Redemption.
Purchaser has attached a Proxy herewith to be signed by the stockholder to enable the Purchaser, at his option, to have the Company purchase the shares tendered by such stockholder. In the event the Company purchases the shares, it will enter into a loan agreement with a United *152 Bank of Colorado Springs, Colorado, which loan will be secured by substantially all of the assets of the Company.
The proxies comported with paragraph 13 of the stock purchases agreement. Under the terms of the stock purchase agreement, the offer to purchase was to expire on October 6, 1978. However, the offer to purchase was extended to November 6, 1978. On or before November 2, 1978, all the CVI shareholders, except petitioner and his family, accepted the offer and irrevocably tendered their shares and submitted their proxies according to the terms of the stock purchase agreement. CVI redeemed all the shares except those of petitioner and his family by payment on the stock purchase agreements in the amounts of $ 223,000 on November 2, 1978, and $ 58,000 on January 2, 1979. After the redemption petitioner owned 100 percent of the shares of stock of CVI through actual and constructive ownership. Petitioner assigned his rights under the stock purchase agreement to CVI on November 2, 1978. However, neither petitioner nor his attorney has any recollection whether all shares were tendered before this assignment of rights. CVI borrowed money from UBCS to make the redemptions as part *153 of the transaction that was closed on November 2, 1978. All the retiring shareholders authorized both the redemption and the loan from UBCS by proxy on that date. UBCS insisted that CVI acquire all the shares except petitioner's before it would approve the loan. The bank suggested and petitioner intended that the transaction be structured as a redemption. Petitioner's name was included as a purchaser on the stock purchase agreement because the shareholders were widely dispersed, because petitioner thought that the shareholders would not understand the consequences of a stock redemption and because petitioner wanted to act quickly before another shareholder who also sought control of the corporation might purchase a majority of the outstanding stock. During the taxable year 1981 petitioner worked as a broker. At that time petitioner was employed by First Colorado Commodities, Inc. (hereinafter referred to as FCC). G. H. Miller and Company (hereinafter referred to as Miller), a commodity brokerage firm, sent commission checks to petitioner totaling $ 3,570.50 in March, April, May, June and July, 1981, and commission checks to FCC totaling $ 13,647.20 during 1981. Petitioner received *154 a Form 1099 from Miller indicating that petitioner had earned $ 3,570.50 in commissions. Petitioners did not report any amount of commissions earned on their 1981 Federal income tax return. Petitioner admits that he received commission income of at Least $ 504.34 from Miller in 1981. During 1981 petitioner owned 50 percent of FCC. FCC reported as income on its 1981 corporate income tax return commissions of $ 12,482. FCC did not report paying any compensation to petitioner in 1981. In his notice of deficiency respondent determined that petitioner constructively received income under sections 301 and 316(a) for the taxable years 1978 and 1979 due to CVI's assumption and payment of petitioner's obligation to purchase the stock of the other shareholders, that petitioner received commission income from Miller during the taxable year 1981 in the amount of $ 3,570, and that petitioner was liable for additions to tax under sections 6651(a), 6653(a) and 6654. OPINION Issue 1: Constructive Dividends
Under sections 301(c) [3] *156 and 316(a), [4] dividends are taxable to the shareholder as ordinary income to the extent of the earnings and profits of the corporation, and any amount received by the *155 shareholder from the corporation in excess of earnings and profits is considered a nontaxable return of capital to the extent of the shareholder's basis in his stock. Any amount received in excess of both earnings and profits of the corporation and the shareholder's basis in his stock is treated as gain from the sale or exchange of property. Dividends may be formally declared or they may be constructive. The face that *157 no dividends are formally declared does not foreclose the finding of a dividend-in-fact. , affg. . It is well settled that the redemption of its shares by a corporation in discharge of a primary and unconditional obligation of its shareholder to purchase the shares constitutes a constructive dividend to that shareholder to the extent of available earnings and profits. ; ; ; , affd. . Respondent maintains that the redemption of the shares of all its shareholders except the shares of petitioner and his family, satisfied petitioner's personal obligation to purchase those shares and therefore constituted constructive dividends to petitioner to the extent of CVI's earnings and profits, a return of capital to petitioner to the extent of his basis in his CVI stock, and capital gain of the remaining amount. We disagree. The evidence shows that petitioner did not incur a primary *158 personal obligation to purchase the shares of stock in issue but that a redemption by the corporation was contemplated by all the parties involved in the transaction. When petitioner first conceived of the plan to obtain control of CVI and approached UBCS for advice, the attorneys of UBCS suggested a redemption transaction. Petitioner lacked sufficient assets to obtain a personal loan, but UBCs was willing to advance a loan to CVI, secured by CVI's assets, to enable CVI to redeem its shares. Petitioner's letter dated September 26, 1978, sent to the other shareholders of CVI explained that the transaction enabling petitioner to become the sole shareholder of CVI would be accomplish either by a direct purchase of their shares by petitioner or a redemption of their shares by CVI. Under the terms of the stock purchase agreement, upon tender of all outstanding shares of CVI other than those belonging to petitioner, an obligation to buy the stock was incurred by the "Purchaser," defined as "Rodlin E. Bunney, or assigns." Jere Knoles, the attorney who drafted the stock purchase agreement, explained that the words "or assigns" were included because the transaction was intended to be structured *159 as a redemption by the corporation and that petitioner's name was included on the agreement merely to facilitate the transaction. We find Knoles' testimony credible, and it corroborates the language in the stock purchase agreement referring to the proxies later signed by CVI's shareholders enabling petitioner never assumed a primary personal liability to purchase the CVI stock but reserved at all times the right to assign his right to purchase toe stock to CVI. The unconditional obligation to purchase all outstanding CVI shares validly tendered under the terms of the stock purchase agreement was incurred by the "Purchaser" which included petitioner or his assigns. The stock purchase agreement in this case is similar to the agreement in , which contained the following paragraph: Buyer [the taxpayer] is to have the right to assign this Agreement to a corporation, thereby releasing Buyer therefrom, and substituting such Corporation in the place of Buyer under this Agreement, with the same force and effect as if this Agreement were orginally made with such Corporation, provided that such Corporation shall, by writing, agree to be bound by all *160 of the terms, covenants and conditions of this Agreement. [.]
In Kobacker we held that the taxpayer had assumed no personal obligation to purchase the stock under contract. Respondent attempts to distinguish Kobacker from this case by arguing that the language quoted from the contract in Kobacker contained an express novation agreement, whereas the stock purchase agreement in this case did not provide for a novation. [5] *161 We do not find this distinction significant. In the contract in Kobacker, the buyer was defined as the taxpayer. Therefore, it was necessary to include a separate paragraph granting the buyer the right to assign the contract. In this case the stock purchase agreement defined the purchaser as petitioner "or assigns" abrogating the need for a separate assignment and novation clause. Furthermore, paragraph 13 of the stock purchase agreement in this case expressly reserves the right of the purchaser to have CVI purchase the stock. The effect of the stock purchase agreement in Kobacker and of the agreement in this case was the same; neither contract created a personal obligation on the part of the individual to purchase the stock. The stock purchase agreement in this case is also like the offer to purchase the outstanding shares of a corporation in . The contract in Ames provided that the taxpayer would "purchase or cause to be purchased" the stock. We held that the promise "to purchase or cause to be purchased" provided several methods for satisfying the obligation created under the contract, and therefore the taxpayer incurred no absolute obligation to purchase the stock. The language in this case designating the purchaser of the CVI stock as petitioner "or assigns" also provided several methods for satisfying the obligation created under the stock purchase agreement, and therefore petitioner incurred no absolute obligation to purchase the shares. Because CVI did not satisfy an absolute and primary obligation of petitioner, the amounts paid in redemption of its shares do not constitute constructive dividends in this case. Respondent argues the petitioner has failed his *162 burden of proving that CVI's redemption did not satisfy petitioner's obligation to purchase the stock because he did not produce all the relevant documents requested by respondent, including the endorsed shares and the stock powers submitted by the CVI shareholders who did not endorse their shares. Respondent contends that these documents would show to whom the shares were transferred -- whether to petitioner or CVI. If the endorsed shares and executed stock powers were within petitioner's control -- which presumably they were -- and could have been produced, petitioner's failure to produce them would justify the inference that the shares were transferred initially to petitioner. See ; see also , affd. . However, such inference would not be determinative of the result we in any event reach in this case. Because petitioner did not incur a primary obligation to pay for the CVI stock, the corporation did not discharge an obligation of petitioner. Whether the stock certificates stood momentarily in petitioner's name until the shares were redeemed *163 is irrelevant. Respondent also raises arguments concerning the timing of the assignment and the effect of the assignment on petitioner's liability under the stock purchase agreement. However, both of these arguments are premised on a finding that petitioner incurred an unconditional, irrevocable obligation to purchase the CVI stock. Because we have found that petitioner never incurred such an obligation, no further discussion is necessary. Respondent argues that petitioner became beneficial owner of all the outstanding CVI shares when they were tendered, and therefore the redemption in this case constituted a distribution to petitioner. We disagree. In this case petitioner did not exercise sufficient control over the tendered shares to warrant a finding of beneficial ownership. The stock purchase agreement in this case created a right in the purchaser, defined as petitioner or his assigns, to purchase the shares. There was no transfer of voting rights or management to petitioner nor did petitioner become entitled to receive dividends until and unless the stock was actually purchased by him. Unlike the trust agreement in , affd. per curiam, *164 [Text Deleted by Court Emendation] upon which respondent relies, which provided the taxpayer the right to vote the stock at any time in any way he pleased, the proxies in this case provided petitioner only the right to vote on November 2, 1978, and only the right to vote for the approval of the redemption and for the approval of the loan agreement with UBCS and to transact any other business that might properly come before the meeting on that date. We hold for petitioners on this issue. Issue 2: Commission Income
Respondent takes the position that petitioner failed to report $ 3,570.50 [6] of commission income on his 1981 Federal income tax return. Petitioner maintains that this commission income is attributable to and was properly reported by FCC on its 1981 corporate income tax return. Petitioner bears the burden of proof on this issue. Rule 142(a). In 1981 petitioner was a broker and an employee of FCC, a commodity brokerage firm. Petitioner reported no commission income for 1981. *165 FCC did not report paying any compensation to petitioner during that year. Petitioner received a Form 1099 for non-employee compensation from Miller in the amount of $ 3,570.50 for the taxable year 1981. At trial petitioner introduced into evidence a letter dated December 30, 1986, from Miller indicating that he had earned $ 3,570.50 and FCC had earned $ 13,647.20 in commissions in 1981. The letter also stated that those amounts had been paid. On the face of the letter are some notations made by petitioner that read as follows: March
504.35
April
517.00
May 18
343.20
June
690.70
July
1438.80
76.05 Adj.
3494.07
Petitioner explained that these notations were made during a telephone conversation between petitioner and an employee of Miller, and that except for the $ 504.35 and $ 76.05 amounts, they track the FCC records and returns. We find that these notations are self-serving and lack credibility. The notations do not add up to $ 3,570.50 without an unexplained adjustment in the amount of $ 76.45. [7] *166 Nor can we find that FCC reported the $ 3,570.50 in earned commissions in income in 1981. The December 30, 1986, letter indicates that petitioner earned $ 3,570.50 and FCC earned $ 13,647.20 in commissions in 1981. FCC's 1981 Federal corporate income tax return shows gross receipts of only $ 12,482. [8] Petitioner attributes the discrepancy to the use by FCC of the accrual method of accounting, and that although the commissions had been earned, they were not paid in 1981. However, the letter from Miller states "The totals above [$ 3,570.50 and $ 13,647.20] reflect the amounts earned and paid as shown on our records." We can only conclude that this language means that the amounts were paid in 1981. Moreover, petitioner has failed to produce independent verification, such as proof of these receipts in later years, to support their explanation. Petitioner testified that the letter shows two separate payees because the initial commission checks earned by FCC came to him personally. Petitioner offers no further explanation as to why such a distinction *167 was made. On his 1981 income tax return, petitioner stated that his evidence to meet his burden of proving that petitioner did not receive the commission checks as a broker in his individual capacity. Issue 3: Additions to Tax
Respondent determined that petitioner was liable for additions to tax under sections 6651(a) and 6653(a)(1) for the taxable years 1977 through 1981 and that he was liable for additions to tax under section 6653(a)(2) for the taxable year 1981 and under section 6654 for the taxable years 1979 and 1980. Petitioner bears the burden of proving that he was not liable for these additions to tax. Rule 142(a). Section 6651(a) imposes an addition to tax for failure to timely file a return unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner failed to timely file his returns for the taxable years 1977, 1978, 1979, 1980 and 1981. In fact, he was late in filing his returns for those years by two to four years. No extensions of statutory filing dates were requested for the years in issue. Petitioner presented no evidence to show that his failure was due to reasonable cause and not due to willful neglect. Accordingly, *168 petitioner has failed to meet his burden of proof on this issue and is liable for the additions to tax under section 6651(a) as set forth in respondent's notice of deficiency. Section 6653(a)(1) as in effect for the years in issue imposes an addition to tax equal to five percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) imposes an additional liability of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) was added by section 722(b) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, and applies in this case only to the taxable year 1981. Petitioner presented no evidence to show that the underpayments in this case were not attributable to negligence or intentional disregard of rules and regulations. Accordingly, he has failed to meet his burden of proof and is liable for the additions to tax under section 6653(a) as set forth in respondent's notice of deficiency. Section 6654 imposes an addition to tax for failure by an individual to pay estimated income *169 tax. Petitioner does not argue nor did he present evidence to show that he had paid his estimated income tax for the taxable years 1979 and 1980. Accordingly, petitioner has failed to meet his burden of proof in this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. 2. Joan K. Bunney is a party in this case solely because she filed joint Federal income tax returns with her husband for the years in issue. Therefore, reference will be made hereinafter only to petitioner Rodlin E. Bunney. ↩
3. Section 301(c) provides: (c) AMOUNT TAXABLE. -- In the case of a distribution to which subsection (a) applies -- (1) AMOUNT CONSTITUTING DIVIDEND. -- That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) AMOUNT APPLIED AGAINST BASIS. -- That portion of the distribution which is not a dividend shall be applied against the reduce the adjusted basis of the stock. (3) AMOUNT IN EXCESS OF BASIS. -- (a) IN GENERAL. -- Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extend that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. (B) DISTRIBUTIONS OUT OF INCREASE IN VALUE ACCRUED BEFORE MARCH 1, 1913. -- That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax. 4. Section 316(a) provides: (a) GENERAL RULE. -- For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders -- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection. ↩
5. Respondent also attempts to distinguish , from this case on other grounds. We have reviewed respondent's other arguments on this issue and find that they lack merit. 6. In his deficiency notice respondent determined that petitioners had underreported $ 3,570 in commission income. This figure represents a rounding off of the $ 3,570.50 allegedly received by petitioner. ↩
7. The notations on the December 30, 1986, letter from Miller include an unexplained adjustment in the amount of $ 76.05. All the notations on the letter, including the $ 76.05 adjustment, add up to $ 3,570.10. 8. In this case respondent had not raised and therefore we need not address any issue concerning FCC's income tax liability. ↩